## THIRLBY v. MANDELOFF.

1. Evidence—Compromise and Settlement.
   Evidence of offers to compromise or concessions and negotiations for a settlement are incompetent and inadmissible, since the admission of such evidence would not tend to work for unlitigated settlement of claims as favored by law.

2. Same—Compromise and Settlement—Admissions.
   Evidence of a compromise or settlement offer may not be received for the purpose of using the offer either as an admission of liability on the part of the offeror or as an admission of a disputed fact.

References for Points in Headnotes
[1, 2, 4] 20 Am Jur, Evidence § 565.
[3] 11 Am Jur, Compromise and Settlement § 2.

3. COMPROMISE AND SETTLEMENT—OFFER—REJECTION. : .
    One of the tests of a compromise is that the offeror offers some-
        thing less than the offeree claims or might fairly otherwise
        obtain by rejecting the offer and suing anyway; there being
        implicit the notion of mutual concession.

4. EVIDENCE—REJECTED OFFER OF COMPROMISE. .
    Testimony as to rejected offer of compromise of unpaid hospital
        bill for one of defendant's injured automobile race drivers,
        ' made incident to defendant's effort to obtain a release of
        garnisheed funds, *held*, reversible error, where liability and
        identity of defendant were hotly disputed at trial of action
        to recover for the medical services rendered.

Appeal from Grand Traverse; Brown (Charles L.), J. Submitted April 9, 1958. (Docket No. 26, Calendar No. 47,707.) Decided June 11, 1958. .

Case by E. L. Thirlby, F. H. Power and others, copartners as Thirlby Clinic, and the James Decker Munson Hospital, a Michigan corporation, against Jean Mandeloff, doing business as Motor Speedways, the appeal being continued in the name of William R. Brown, administrator of his estate, for medical services rendered an injured automobile race driver. Verdict and judgment for plaintiffs. Defendant appeals. Reversed and remanded.

*Harry T. Running,* for plaintiffs.

*Murchie, Calcutt & Brown,* for defendant. ·

VOELKER, J. On August 30, 1952, a professional itinerant auto racer named Haukedahl was severely injured on the race track at the Traverse City fairgrounds while participating as a driver in an auto race put on by the defendant, an impresario of this amiable form of public suicide who hailed from Florida. Haukedahl's left arm was almost torn off at the shoulder; he was taken to the plaintiff hos-

pital and given emergency treatment and his arm amputated by Dr. Power of the plaintiff clinic; thereafter someone appeared at the hospital and discussed with Dr. Power the cost of the treatment and allegedly then told Dr. Power that he would take care of Haukedahl's hospital and doctor bill.

Haukedahl's stay was prolonged; the hospital and doctor bill came to $1,125.40; it was never paid; and some 2 years later when the defendant came back to Traverse City to stage more auto races, the plaintiffs promptly garnisheed $1,085.82 which the defendant had coming from the fair association. This happened on the Saturday before the fair ended. Defendant said he needed his money released to pay the drivers and conclude the balance of his racing program, and he offered to pay half of plaintiffs' bill in cash and half by his unsecured promissory note, which offer was rejected.

At the trial plaintiffs were permitted to testify to this transaction over defendant's objection, and on this score the court instructed the jury as follows:

"Now, it is rather an unusual case, in some respects. I am going to be very honest and say I am not yet sure I should have permitted the testimony of this conversation of Mr. Mandeloff with Mr. Running and Dr. Power relative to settlement or attempted settlement of this lawsuit. I admitted that testimony, and it has been explained, of course, by Mr. Mandeloff, on the one side, that he called Dr. Power up after his funds were tied up last September 4th, this past year, as a result of the garnishment issued against the Northwest Michigan Fair Association, from whom he had $1,085.82 coming at that time.

"It is true that an offer of compromise is not admissible. The argument here this morning was whether or not there was an offer of compromise, when he offered to pay the full amount of the entire bill now being sued for—at least, the full amount of the doctor and hospital bill. Of course, he apparent-

ly offered to pay $500 down, in cash, and the balance in the form of a promissory note, unsecured.

"You must, of course, bear in mind that that offer was rejected; that offer was not accepted by the hospital, by Doctor Power or by Mr. Running. If that amount had been 50¢ or $50 lower, there isn't any question—we couldn't have considered it in any way.

"My problem here this morning—I am very frank with you—is whether or not the amount was a full amount; was that an offer of compromise as to the time within which to make payment? And that is the only reason I allowed that in evidence. So it is up to you to determine that: was that an offer of compromise?

"Now, if you find that the defendant, Mr. Mandeloff, called up and offered to pay this in such manner: $500 down and the balance by a promissory note— under this pressure—and if he was actually short of funds, and not just trying to get out of paying it, that in and of itself is not an admission of liability on his part."

At the trial the big question was the identity of the man who allegedly told Dr. Power he would pay the bill. Dr. Power was not sure; some time had elapsed between the event and the trial; the conversation had taken place in a darkened hallway; he did not remember the man's name if he ever knew it; but he was pretty sure it was the defendant and not one Peruzee (who had to do with insurance for the auto racers and had also visited the hospital) because he remembered that the man he talked to had said he was putting on the auto races and further that the defendant was built more like the man he talked to than was Peruzee.

The jury brought in a verdict for the full amount, upon which judgment was entered, and the defendant's fiduciary (defendant having since died) appeals here, urging among other things that the court erred in admitting evidence of the compromise settlement.

In Michigan, as elsewhere, it is the rule that evidence of offers to compromise or concessions and negotiations for a settlement are incompetent and inadmissible. There is a succinct little essay on this subject at 5 Callaghan's Michigan Pleading and Practice, § 36.507, citing numerous cases. The reason for the rule is that the law is said to favor peaceful settlements and that to admit unaccepted offers of compromise or ineffective attempts to reach a settlement would work quite the opposite result and serve to encourage legal war rather than peace in the settlement of claims already in or headed for litigation. Thus the above source indicates that evidence of a compromise or settlement offer may not be received for the purpose of using the offer either as an admission of liability on the part of the offeror or as an admission of a disputed fact.

This rule has over the years been eroded by some exceptions. It is said that admissions of independent facts made during such negotiations are ordinarily admissible as are admissions not expressly made to make the peace. Numerous illustrations of these exceptions are noted in the text above cited. It is also said that the admission or exclusion of evidence of such negotiations may or may not be reversible error, one of the tests being whether it was prejudicial. Thus the admission of the testimony of the husband of a plaintiff in an automobile accident case that the defendant told him his "representative" would communicate with him for the purpose of settlement was held to be prejudicial error where the question of contributory negligence was close. *Sexton* v. *Niewoonder,* 296 Mich 443.

In *Olshove* v. *Pere Marquette R. Co.,* 263 Mich 579 at 581, we said that "The rule that an offer of compromise cannot be shown as admission of liability is well settled in this State" and that "The rule is too salutary to be whittled away." One of the tests

of a compromise is that the offeror offers something less than the offeree claims or might fairly otherwise obtain by rejecting the offer and suing away. The notion of mutual concession is implicit. 11 Am Jur, p 246.

Here we have a defendant who was in the midst of the final week end of a country fair with all his prize money tied up by the plaintiffs' garnishment. If he could somehow free that money the show could go on; if not no motors would roar, no autos would race (and in fact did not). Thus squeezed he made the proposition that he made. While the subject matter of the compromise plainly grew out of the old unpaid hospital and doctor bill, the immediate subject of the compromise was the pending garnishment suit. Had plaintiffs accepted defendant's offer they too would have compromised by releasing a large possible cash bird in the hand for part payment and an unsecured note in the bush by a travelling non-resident entrepreneur. Perhaps sensibly, they rejected it. We think that should have been the end of it. Instead they chose to put the offer in evidence. We think the admission of this evidence was error. The question remains: was it prejudicial error?

Liability was the big issue in this case. It was disputed by the pleadings; it was disputed—or at least not admitted—by the harried defendant when he made his offer; it was hotly disputed at the trial. In a case of this kind where the sole dispute was identity and liability of the defendant we think that the admission of evidence of the rejected offer of compromise was clearly erroneous and, under the circumstances, rather obviously prejudicial, and we must therefore reverse and remand for a new trial, with costs to the defendant.

Dethmers, C. J., and Carr, Kelly, Smith, Black, Edwards, and Kavanagh, JJ., concurred.